IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHNNY GONZALES ALVAREZ, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. 3:12-CV-03569-BK |
| | § | |
| | § | |
| CAROLYN COLVIN, | § | |
| Acting Commissioner of the Social | § | |
| Security Administration, | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Pursuant to the parties' consent to proceed before the magistrate judge (Doc. 22), this case has been transferred to the undersigned for a final ruling. For the reasons discussed herein, Plaintiff's *Motion for Summary Judgment* (Doc. 20) is **DENIED**, and Defendant's *Motion for Summary Judgment* (Doc. 23) is **GRANTED**. The Commissioner's decision is **AFFIRMED**.

### I. BACKGROUND

**A.    Procedural History**

Johnny Gonzalez Alvarez (Plaintiff) filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) in November 2007, alleging an onset disability date of April 2007 due to problems with his right arm, right shoulder, and lower back as well as carpal tunnel syndrome in both hands.[1] (Tr. 10, 201-206, 240, 260, 267, 282). His applications were denied at all administrative levels, and he now appeals to the United States District Court, *pro se*, pursuant to 42 U.S.C. § 405(g). (Tr. 1-3, 7, 10-19, 76-82, 92-93, 106-08, 187).

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

**B.**     <u>Facts</u>

Plaintiff was 49 years old on his alleged disability onset date, and he had a high school education and past relevant work experience as an auction assistant. (Tr. 18, 44-46, 246, 286). His problems began in May 2004 when he suffered an injury at work after falling and landing on his right arm with his elbow fully extended. (Tr. 604). X-rays and an MRI conducted at the time revealed no injury, however, and he was treated conservatively. (Tr. 362, 604). Nevertheless, Plaintiff continued to report for more than a year significant pain of at least 7 of 10 on the pain scale, and stated that over the counter pain medication did not help him. (Tr. 361-62, 369-71, 373-75, 377-79, 381-82, 385, 394, 400, 459). He had carpal tunnel release surgery on his right hand in September 2004. (Tr. 660).

In March 2007, Plaintiff went to a hospital clinic with complaints of pain in both arms and numbness in his right fingertips. (Tr. 669). He stated that he had just started working again, doing manual labor. *Id.* The nurse told him to buy a wrist brace and do the exercises they discussed, and she gave him prescription medication. *Id.* The following month, Plaintiff returned to the clinic complaining of numbness and weakness bilaterally in his upper extremities and pain with flexion in his left hand. (Tr. 666). He was again told to wear a wrist brace and given prescription medication. (Tr. 667).

At an April 2008 consultative examination, Dr. Harold Nachimson assessed Plaintiff with a history of bilateral carpal tunnel syndrome with surgical procedure on the right hand, but an otherwise "normal general exam." (Tr. 674-677). Plaintiff represented that he took no medications. (Tr. 674). The range of motion in his neck was mildly restricted with local tenderness, but his shoulders and elbows had full range of motion, his grip strength was 5

of 5 in both hands, and the muscle tone in his upper extremities was 5 of 5. (Tr. 675-76).

A March 2009 examination of Plaintiff at an orthopedic clinic revealed that he had 5 of 5 bilateral upper extremity strength, his sensation was grossly intact throughout, and he had normal deep tendon reflexes and full range of motion of his cervical spine with no tenderness on palpation. (Tr. 749). Further, there was no evidence of cervical radiculopathy or disk herniation. *Id.* That same month, Plaintiff underwent an electrodiagnostic study at a rehabilitation clinic. During the initial physical examination, Plaintiff tested positive for Spurling's[2] bilaterally and Hoffmann's sign[3] on the left, and he had a limited range of motion in his shoulder. (Tr. 780). Following the electrodiagnostic study, the doctor's impression was that Plaintiff had mild neuropathy of the left wrist consistent with left carpal tunnel syndrome, but the findings on the right wrist were normal. (Tr. 783). Additionally, there was no evidence of cervical radiculopathy or polyneuropathy of the left upper extremities. *Id.* The doctor recommended that Plaintiff use a splint and prescription medication for the wrist neuropathy, obtain occupational therapy to increase his range of motion, and strengthen his left upper extremities. *Id.*

At a July 2009 consultative examination conducted by Dr. Cesar Duclair, Plaintiff had full range of motion of all joints in his upper and lower extremities, including his right and left

---

[2] Spurling's test is an evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side. Axial compression force is then applied by the examiner through the top of the patient's head. The test is considered positive if the maneuver elicits radicular arm pain. *Stedman's Medical Dictionary* (27th ed. 2000), available on Westlaw.

[3] Hoffmann's sign is "an abnormal reflex elicited by sudden forceful flicking of the nail of the index, middle or ring finger, resulting in flexion of the thumb and of the middle and distal phalanges of one of the other fingers. It is not a very reliable sign of pyramidal tract disease above the level of the seventh or eight cervical and first thoracic vertebrae." *Mosby's Medical & Nursing Dictionary* at p. 537 (2d ed. 1986).

hand, no tenderness in the cervical or lumbar spine, grip strength of 5 out of 5 on the right and left although he had slight weakness of the right thumb, normal wrist and elbow extension and flexion, normal shoulder abduction, and full sensation in his upper and lower extremities. (Tr. 799-800, 804). Plaintiff denied shoulder and elbow pain. (Tr. 799). The only clinical impression Dr. Duclair noted was right-sided carpal tunnel syndrome, status post carpal tunnel release. (Tr. 800).

Plaintiff's diagnostic tests of record also revealed relatively minor findings. Despite Plaintiff's complaints of disabling shoulder pain, October 2008 x-rays of both shoulders revealed only "subtle" osteoarthritis on the left and "minor" osteoarthritis on the right with both sides indicating spur formation. (Tr. 720-721). A February 2009 MRI of the cervical spine revealed "minimal degenerative changes." (Tr. 752). In August 2009, it was noted that Plaintiff's shoulders had worsened with x-rays revealing very minimal joint arthritic changes in both shoulders, while an MRI showed a partial tear of the supraspinatus as well as tendinopathy on the both sides. (Tr. 824-25). Plaintiff was given steroid and pain medication injections, after which he reported feeling better, and the doctor advised him to begin strengthening exercises. (Tr. 824).

As for Plaintiff's mental status, approximately two weeks after his 2004 work injury, medical staff noted the "presence of symptoms that may represent psychological difficulty," including Plaintiff's complaints of tension headaches, waking up due to pain, and continued arm and elbow pain. (Tr. 359). In August 2008, Plaintiff went to the emergency room for psychiatric services due to suicidal ideation and severe depression, and he was given an anti-depressant medication. (Tr. 693). He stated that he was severely depressed due to his impending divorce,

4

the loss of his home, and the pain in his shoulder. (Tr. 695, 698). In December 2008, he was diagnosed with "bipolar I disorder, most recent episode depressed with severe psychotic features" and prescribed multiple medications after threatening to jump off a bridge. (Tr. 724). He noted that the medications helped with his suicidal ideations, but he was not sleeping, was tearful, had a decreased appetite, and had not been seen by a mental health professional or taken any medications since October 2008. *Id.*

By the next month, however, Plaintiff reported that he was "doing much better." (Tr. 735). By February 2009, Plaintiff said that he was taking his medication only "sporadically" because it made his ears ring, but admitted he probably would not take a different medication even if it did not cause his ears to ring. (Tr. 741). Otherwise, he stated he was "doing well." *Id.* By April 2009, Plaintiff had no suicidal ideation, had an adequate support system, and was able to maintain meaningful relationships. (Tr. 763). He said he was doing well so he did not want to take medication anymore. (Tr. 766). In May 2009, Plaintiff again refused medication. (Tr. 760). He stated that he was "doing OK" in August 2009, noting that he only felt depressed when his ex-wife called. (Tr. 827). Clinic staff noted that his depression was "mild" during this time frame. (Tr. 837, 840, 843, 850).

At a July 2009, consultative psychological evaluation with Dale A. General, Ph.D., Plaintiff reported that he had taken no psychoactive medication since December 2008. (Tr. 811). He said he quit taking the medicine because it made him "feel bad," and reported only taking ibuprofen for his pain. *Id.* Dr. General opined that Plaintiff could care for his personal needs and conduct some household chores, although he reported that he could not sweep or mop because of problems with his hands. (Tr. 812). Additionally, Dr. General observed that Plaintiff could

5

prepare simple meals, do his own laundry, handle day-to-day stressors, travel in unfamiliar places, use public transportation, manage his own finances, count money, and shop. *Id.* Dr. General noted that Plaintiff was cooperative and appropriate in his personal interaction with the examiner and was able to converse without difficulty, he had some friends at the shelter where he lived although he otherwise tended to stay to himself, and he did not report difficulty relating to people in authority. *Id.* Dr. General found Plaintiff's thought processes to be logical and goal-directed and his concentration to be intact, although his intellectual functioning was estimated to be in the borderline- to low-average range. (Tr. 813).

Upon psychological testing, however, Dr. General stated that Plaintiff's validity profile strongly suggested that he was either responding randomly or "faking bad." (Tr. 814). Furthermore, Dr. General noted that Plaintiff's F Scale score indicated "a strong likelihood that the obtained clinical profile is invalid." *Id.* Dr. General opined that Plaintiff's clinical profile was indicative of a strong psychological proponent to physical illness, and individuals scoring at that level had a tendency to avoid responsibility through the development of physical symptoms. *Id.* Plaintiff's profile was also highly suggestive of extreme depression, pessimism about the future, and acute psychological turmoil. *Id.* Dr. General diagnosed Plaintiff with major depressive disorder, recurrent, moderate and said that his prognosis in the absence of treatment was poor. (Tr. 815).

Dr. General completed a Medical Source Statement that described Plaintiff's mental ability to do work-related activities. The statement indicated that, due to his borderline intelligence, Plaintiff could understand, remember, and carry out simple instructions and make judgments on simple work-related decisions, but would have moderate difficulty in those areas if

complex instructions were involved. (Tr. 817). Dr. General also opined that, due to his depression, Plaintiff would have moderate difficulty interacting appropriately with the public, a supervisor, and co-workers and would have mild difficulty responding appropriately to changes in the work setting. (Tr. 818).

C.      **The Administrative Proceedings**

In November 2009, the ALJ issued his decision, finding Plaintiff not disabled under the Act. (Tr. 10-19). At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 12). At step two, the ALJ determined that Plaintiff had the severe impairments of carpal tunnel syndrome, degenerative joint disease of the left shoulder, disorder of the back, major depressive disorder, and borderline intellectual functioning. *Id.* At step three, the ALJ found that Plaintiff's impairments failed to meet or equal a listed impairment for presumptive disability under the regulations. (Tr. 13-14).

Next, the ALJ determined that Plaintiff retained the residual functional capacity (RFC) to (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) sit, stand and walk for six hours in an eight-hour day; and (3) occasionally climb, balance, stoop, kneel, crouch, carry, perform overhead reaching with the left upper extremity, and perform frequent handling, but that the movements must be varied. (Tr. 14). Further, the ALJ found that Plaintiff could understand and carry out simple instructions, have limited, incidental interaction with coworkers and supervisors, adapt to a routine work environment, and have superficial contact with the public. *Id.* At step four, the ALJ found that Plaintiff was capable of performing his past relevant work as an auction assistant. (Tr. 18). The ALJ went on to make an alternative step five finding that

Plaintiff could perform other jobs existing in significant numbers in the national economy. (Tr. 19).

On appeal of the ALJ's decision, Plaintiff's attorney submitted additional medical evidence to the Appeals Council. (Tr. 852-1008). In relevant part, the evidence indicated that Plaintiff continued to complain of neck pain, and he was prescribed medication for the pain, advised to take warm showers, and work on increasing his range of motion through exercise. (Tr. 887). In March 2011, Plaintiff presented to the hospital complaining of neck pain and asking to get a food stamp form filled out. (Tr. 990). Hospital notes indicate that the form was signed with a notation that Plaintiff could return to work but could not engage in heavy lifting. *Id.* Physician notes listed Plaintiff's diagnosis as osteoarthritis of the cervical spine and shoulder and noted that he exhibited a decreased range of motion and strength in these areas, but had no tenderness or spasm. (Tr. 991). While the Appeals Council acknowledged the new evidence, it upheld the ALJ's ruling. (Tr. 1-4).

## II. APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an

individual is capable of performing his past work, a finding of "not disabled" must be made; (5) if an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(a)(4), 416.920 (a)(4)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* If the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett*, 67 F.3d at 564. Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### III. ARGUMENTS AND ANALYSIS

Although Plaintiff was represented by counsel in the administrative proceedings, he is proceeding in this Court *pro se*. His summary judgment brief is over 100 pages long, consisting almost entirely of medical records already in evidence. (Doc. 20). In an "Issues Presented" portion of the brief, Plaintiff recounts some of his medical treatment and states that he has pain in his neck, spine, both hands, and both shoulders for which he takes medication. *Id.* at 4. In his "Statement of Case," he lists his physical and mental impairments and states that physical therapy and exercise exacerbate his pain. *Id.* at 38. In Plaintiff's "Argument" section, he states that the medications he took made his stomach upset, and he cannot get a job due to his injuries and because he could not pass a drug test due to the medications he takes. *Id.* at 90. Plaintiff also states that he could not get an attorney to assist him in this appeal. *Id.* Finally, in the "Relief Sought" portion of his brief, Plaintiff states that he will continue seeing doctors and doing physical therapy. *Id.* at 103.

Defendant responds with a general defense of the ALJ's decision, addressing the evidence supporting the ALJ's RFC finding, the ALJ's evaluation of Plaintiff's subjective complaints, and the ALJ's conclusion that Plaintiff was not disabled at step four and alternative step five finding. (Doc. 24).

Liberally construing Plaintiff's brief, he argues that the medical evidence in the record supports his claim for disability benefits. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (providing that the courts should liberally construe *pro se* pleadings). The Court finds, however, that the ALJ's determination that Plaintiff's impairments were not severe is supported by substantial evidence. *See Greenspan*, 38 F.3d at 236. An impairment is not severe "if it is a slight

abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). A claimant must show that he is so functionally impaired by his impairment that he is precluded from engaging in any substantial gainful activity. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

In this case, substantial evidence supports the ALJ's decision that Plaintiff retained the RFC for a modified range of light work. The RFC is an assessment, based on all of the relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite his impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). RFC refers to the most that a claimant is able to do despite his physical and mental limitations. 20 C.F.R. § 404.1545(a). The RFC is considered by the ALJ, along with the claimant's age, education and work experience, in determining whether the claimant can work. 20 C.F.R. § 404.1520(f). In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. SSR 96-8p; 20 C.F.R. § 404.1523.

Here, the ALJ performed a thorough analysis of Plaintiff's condition based on the objective medical evidence, which indicated that while Plaintiff had some physical limitations, they were not disabling and were treated conservatively. For example, Plaintiff was given prescription medication and advised to wear a wrist brace and engage in strengthening exercises. (Tr. 667, 783). Consultative physicians noted that he generally had normal physical exams with good muscle tone and range of motion in his upper extremities and good grip strength. (Tr. 674-677, 749, 799-800, 804). Plaintiff's diagnostic tests revealed relatively minor findings, including

"subtle" osteoarthritis of the left shoulder, "minor" osteoarthritis of the right shoulder, and minimal changes to his cervical spine. (Tr. 720-721, 752). Although the condition of Plaintiff's shoulders did worsen over time, he still was treated conservatively with steroid injections and advice to exercise. (Tr. 824-25). The ALJ's determination that Plaintiff physically could perform a modified version of light work is thus supported by substantial evidence. *Leggett*, 67 F.3d at 564.

This determination is further supported by Dr. General's assessment of Plaintiff's personality type based on detailed testing which suggests that Plaintiff may be malingering, whether consciously or subconsciously. *See* Tr. 814 (finding that Plaintiff's validity profile strongly suggested that he was either responding randomly or "faking bad"; Plaintiff's F Scale score indicated "a strong likelihood that the obtained clinical profile is invalid"; Plaintiff's clinical profile indicated a strong psychological proponent to physical illness, and individuals scoring at that level have a tendency to avoid responsibility through the development of physical symptoms). Finally, Plaintiff's daily activities belie his claims of severe, debilitating pain. For example, Plaintiff testified that he could cook, do laundry, and shop for groceries. (Tr. 65-66); *see Leggett*, 67 F.3d at 565 n.12 (finding that a claimant's daily activities may properly be considered when deciding a claimant's disability status); *Griego v. Sullivan*, 940 F.2d 942, 944-45 (5th Cir. 1991) (finding that the claimant's daily activities belied her subjective complaints of disabling pain).

In reaching his decision, the ALJ also properly considered Plaintiff's subjective complaints of pain. While pain can be disabling, it is not an automatic ground for entitlement to disability benefits. *Hames*, 707 F.2d at 166. Pain is recognized as a disabling condition under

the Act only where it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *Id.* The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort. *Id.* Plaintiff must show that he is so functionally impaired that he is precluded from engaging in substantial gainful activity. *Id.* As discussed, Plaintiff cannot make that showing in this case. Further, no manifestations of severe pain through muscular atrophy, contracture, or other tissue changes were described in Plaintiff's medical records. *See id.* As noted by the *Hames* Court, "the absence of any sign of severe or continuous pain as manifested by discernible and observable criteria such as significant weight loss, impairment of general nutrition, or other local morbid changes which would likely be present" if Plaintiff was in severe and unremitting pain also is significant. *Id.*

In terms of Plaintiff's mental health issues, the ALJ's finding that Plaintiff could perform light work with some modifications also is supported by substantial evidence. Plaintiff's counseling records indicate that his symptoms of extreme depression lasted for no more than four to five months when he was going through a divorce and lost his home. *Cf. Hames*, 707 F.2d at 165 (stating that the claimant must show that his impairment caused him to be unable to engage in substantial gainful activity for a period of at least 12 months). Plaintiff quickly stopped taking his prescription medication against doctor's orders and, while still mildly depressed, generally indicated that he was doing fine. (Tr. 735, 760, 763, 766, 827, 837, 840, 843, 850); *see also Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) (where medication or therapy would remedy an impairment, the claimant will not be found disabled).

Additionally, the ALJ compensated for Plaintiff's borderline intellectual disorder by limiting him to jobs that required the ability only to understand and carry out simple instructions.

13

(Tr. 14). This limitation is in line with Dr. General's Medical Source Statement, which noted that Plaintiff could understand, remember, and carry out simple instructions and make judgments on simple work-related decisions. (Tr. 817). The ALJ's conclusion that Plaintiff could have incidental interaction with coworkers and supervisors and superficial contact with the public and could adapt to a routine work setting took into account Dr. General's opinion that Plaintiff's depression would cause him to have moderate difficulty in those interactions and mild difficulty with workplace changes. (Tr. 14, 818). Accordingly, the ALJ's determination that Plaintiff mentally could be expected to perform the modified version of light work described by the ALJ also is supported by substantial evidence. *Leggett*, 67 F.3d at 564.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's *Motion for Summary Judgment* (Doc. 20) is **DENIED**, Defendant's *Motion for Summary Judgment* (Doc. 23) is **GRANTED**, and the Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on May 3, 2013.

*[signature]*
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE